This suit is the result of a collision at the intersection of Government and St. Charles Streets, in the City of Baton Rouge, on February 10, 1939, at about the hour of 11:55 p.m., between a taxi driven by Clyde Glynn and a Studebaker automobile driven by Sam Culotta. Government Street runs east and west, and by ordinance of the City of Baton Rouge, it is a right of way street; the taxi driver was driving west. St. Charles Street runs north and south, and is a less favored street; Culotta was driving north. The taxi was owned by Joseph Henderson, doing business as Ever Ready Taxi Line, and there is no dispute that it was being operated by Glynn, an employee of Henderson, in the course and scope of his employment and that Great American Indemnity Company, under a policy of property damage insurance, is responsible if there is any liability on the part of Clyde Glynn. The Studebaker automobile was owned by Mrs. Annie B. Curry and was being driven by Sam Culotta, a garage man, to whom it had been entrusted for repair.
The World Fire Marine Insurance Company, the collision insurer of the said automobile, plaintiff herein, was subrogated to the rights of Mrs. Curry, and brings this suit against the two drivers and Glynn's employer and his insurer, in solido, for the sum of $750 as the alleged damage to the automobile, alleging that the automobile was a total loss by virtue of the collision.
On trial, the plaintiff entered a remittitur of $81.25, representing the salvage which plaintiff received from the sale of the wrecked automobile. The trial *Page 536 
judge rendered a judgment in favor of plaintiff and against the defendants, in solido, in the sum of $668.75. All defendants have appealed.
There are two sets of defendants, represented by different firms of attorneys. As there isn't any question of imputed negligence to the automobile owner, and as each defendant alleges that the fault of the collision is charged to the other, there are only two issues to be decided: (1) Who was responsible for the collision, if one or both, and (2) the amount of damage caused to the automobile.
There were but two eyewitnesses to the accident, the driver of each vehicle, and, as usual, their testimony is conflicting, each trying to lay the blame on the other.
Sam Culotta states that he was driving towards his home, at about midnight, on St. Charles Street, at about twenty to twenty-five miles per hour, and when nearing the intersection, he reduced his speed, coming almost to a complete stop at the intersection, looked both east and west, saw what he took to be two cars to the east, approaching westward, about a block away. Believing that he had ample time to make the crossing, he put his car in second speed and proceeded across the intersection; that when he had reached the north end of the intersection, and beyond the old street car tracks, which were about the middle of Government Street, he was struck by a taxi at about the center or maybe a little more to the back of his car; that he never saw the taxi prior to his being hit; that the taxi hit him with such force as to cause the automobile which he was driving to take a northwestern course in the direction of the O.K. Radiator building situated on the northwest corner of the intersection, hitting the corner of the building and a wrecker standing nearby, and causing his automobile to come to rest facing the opposite direction from which he was travelling. He estimates the speed of the car that hit him as at least sixty to sixty-five miles per hour; that he left the scene of the accident, walked a block away on Government Street to a friend's home to obtain medical help and to be taken home. He insists that he was hit near the northern part of the intersection, the front end of his car being at about the north curb line of Government Street.
Clyde Glynn states that he left the permanent taxi stand on 1325 Government Street at about 25 minutes to twelve to make the 11:55 train at the Y. M.V. Station, situated at the foot of North Boulevard, which was about a mile from that point; that he was by himself and had ample time to make it; that the accident happened about 20 minutes or a quarter to twelve; that it had been raining and the pavement was wet; that he was driving on the right-hand side of the street; that when he first saw the Studebaker it was crossing Government Street, and at that time he "was right at the intersection". He states that he failed to see the Studebaker before that time on account of it not having any good lights, "very, very dim lights", and that, at that time, it was "kind of drizzling rain". He further states that he could have seen the Studebaker car on St. Charles Street, but failed to do so on account of the Studebaker's lights and fast speed. He states that he was driving at about twenty and twenty-five miles per hour, and that Culotta was driving faster than he was. He states that when he saw the Studebaker within the intersection he applied his brakes, "but it was too late at that time. I applied by brakes, but travelling so fast, it didn't do any good"
(underscoring ours); that when he applied his brakes, he was just then at the intersection, on his right-hand side; it had been raining and he "guessed they would be slippery from the rain", referring to the streets. He maintains that the Studebaker struck his taxi, yet he admits that the front part of his car struck the Studebaker back of the front fender. He explains this "By him coming around so fast, I had applied my brakes and that made it kind of sideswipe. It was a glancing lick". He further states that his car went forward for some seven steps, and was turned around facing east, the direction from which it came, on the south side of Government Street; that Culotta was travelling so fast that he kept on across to the O.K. Radiator and struck and slided up against the building facing south; that he estimates Culotta's speed around sixty miles per hour. He again states that he was driving nearer to the right, between the old car line and the curbing and nearer to the curb. He admits signing a statement to the then attorney representing Culotta *Page 537 
on the following day, but does not remember what he told the attorney.
The statement as given by him reads as follows:
"State of Louisiana,
"Parish of East Baton Rouge.
"Before me the undersigned authority personally appeared: Clyde Glynn who did depose and say: At about midnight of February 10, 1939, I was driving a taxi in line with my duties owned by the Ever Ready Taxi Co., being a Hudson Terraplane, 1937 Sedan west on Government Street. I was driving about 30 to 35 miles per hour and was by myself. I saw a car coming out of St. Charles Street going north crossing Government Street and I applied by brakes and stopped just at the beginning of the intersection of the two streets — I stopped just at the Eastern side of the intersection and was on my right hand side of Government Street. As I was stopped there the other car's right rear fender hooked on to the left part of my bumper causing my car to be turned around completely and headed East on Government Street my car being in about the south side of the old street car tracks.
"The lights on the other car were very dim. They looked more like red lights. At the time I was on the way to the Y. M.V. railroad station to meet the train coming in from New Orleans and due in at 12 P.M.
"2 other taxis from my company left to meet the same train at about the same time. Another one left the place a little later to meet the same train. All came up Government All came up right after my accident and all stopped to see about it and then one went on to see about the train. When the accident happened the cab from the company closest to me was about at least three blocks away.
"My chauffeur's license is No. 767 and City No. 6.
"I know that I made a dead stop before my car even got into the intersection of Government Street and St. Charles Street and I was hit as I was stopped there.
"There were no people around where the accident happened and no witnesses to the accident at all.
"The other car had 1938 licenses.
"(Signed) Clyde Glynn.
"Sworn to and subscribed before me on the 11th day of February, 1939, in the presence of the undersigned witnesses:
"Witnesses:
"(Sgd.) G. Hall
"P.L. Wesley
"(Signed) Theo F. Cangelosi,
"Notary Public."
This statement was fully proven as being taken by Mr. Cangelosi while everything was fresh in Glynn's memory. To us this fully establishes the facts as they were then in Glynn's mind.
The physical facts show that the Studebaker car was struck somewhat in the rear of the right front fender, at about the middle of the front door, and about the middle of the rear door, and part of the right fender. The taxi shows that the whole front struck the Studebaker rather than a sideswiping as contended by Glynn.
Our interpretation of the evidence is that the physical facts bear out defendant Culotta's evidence to the effect that he had driven in a careful manner in approaching the intersection; that he reduced his speed, coming to a practical stop, not perceiving any traffic requiring him to come to a complete stop, entering the intersection on second speed, proceeding across, and that when he had practically two-thirds of the said intersection completed, he was run into by the taxi driven by Glynn with such a force as to cause his automobile to reverse itself from the direction it was going and to proceed against the O.K. Radiator building and the wrecker alongside. The cause of the Studebaker going that distance is explained by the fact that Mr. Culotta did not have his car under brake, and, as testified by Glynn, he had his car under brake.
We are therefore of the opinion that the accident was caused by the negligence of the taxi driver, and not contributed to by any negligence of the other defendant, Sam Culotta.
As to the damages to Mrs. Curry's automobile, it has been definitely proven that the loss was a total one, save the salvage value. The cost of the automobile was $1028, and, at the time of the wreck, had been used for thirteen months, showing a mileage of approximately 13,000 miles. According to the insurance adjuster, the automobile had depreciated, on account *Page 538 
of age and use, to the extent of $278, thus making the value of the autobile, at the time of the accident, the sum of $750, which amount was paid by the insurance carrier, plaintiff in this suit. As against this valuation, we have the testimony of Mr. Methvin, the owner of the O.K. Radiator Company, an automobile body repair shop, of a value of $550 to $600, and the testimony of Mr. G.C. Hall, his foreman, who placed the cost of repair of the automobile in the "neighborhood of five or six hundred dollars". It appears strange to us that an insurance adjuster would place a valuation on an automobile for more than it is worth. Mr. Methvin states, in his testimony, that the allowance was a very liberal offer and would want to infer that the insurance company was liberal with its money. Without discussing the relative ability of the insurance adjuster and of Mr. Methvin as to the value of the automobile at the time of the accident, we find no reason to disagree with the trial judge's conclusion in accepting the insurance adjuster's valuation of the automobile at $750, less the salvage value of $81.25, making a net loss of $668.75, and for which he granted judgment.
For these reasons assigned, it is ordered that the judgment appealed from be amended by disallowing plaintiff's claim as against defendant Sam Culatto, and, as thus amended, it is affirmed, all at the cost of Joseph Henderson, Clyde Glynn and the Great American Indemnity Company. *Page 597